IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

GREGORY L. ACKERMAN,

    Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

No. C08-1020

RULING ON JUDICIAL REVIEW

_____

**TABLE OF CONTENTS**

I.     *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    *PROCEDURAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . . . . 2

III.   *PRINCIPLES OF REVIEW.* . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   *FACTS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     *A.*    *Ackerman's Education and Employment Background.* . . . . . . . . . . . 5
     *B.*    *Administrative Hearing Testimony.* . . . . . . . . . . . . . . . . . . . 5
         *1.*    *Ackerman's Testimony.* . . . . . . . . . . . . . . . . . . . . . . . 5
         *2.*    *Mary Fuss' Testimony.* . . . . . . . . . . . . . . . . . . . . . . . 6
         *3.*    *Vocational Expert's Testimony.* . . . . . . . . . . . . . . . . . . 7
     *C.*    *Ackerman's Medical History.* . . . . . . . . . . . . . . . . . . . . . . 8

V.     *CONCLUSIONS OF LAW.* . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     *A.*    *ALJ's Disability Determination.* . . . . . . . . . . . . . . . . . . . 15
     *B.*    *Objections Raised by Claimant.* . . . . . . . . . . . . . . . . . . . . 17
         *1.*    *Dr. Anderegg's Opinions.* . . . . . . . . . . . . . . . . . . . . 18
         *2.*    *Substantial Medical Evidence.* . . . . . . . . . . . . . . . . . . 23
         *3.*    *Credibility Determination.* . . . . . . . . . . . . . . . . . . . 25
         *4.*    *New Evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . 28
     *C.*    *Reversal or Remand.* . . . . . . . . . . . . . . . . . . . . . . . . . 30

VI.   *CONCLUSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VII.  *ORDER.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Gregory L. Ackerman on June 10, 2008, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Ackerman asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Ackerman requests the Court to remand this matter for further proceedings.

# II. PROCEDURAL BACKGROUND

On January 21, 2004, Ackerman applied for both disability insurance benefits and SSI benefits. In his applications, Ackerman alleged an inability to work since May 30, 2001 due to depression, anxiety, difficulty sleeping, and problems with concentration and memory.[1] Ackerman's applications were denied on March 29, 2004. On August 11, 2004, his applications were denied on reconsideration. On August 31, 2004, Ackerman requested an administrative hearing before an Administrative Law Judge ("ALJ"). On August 19, 2005, Ackerman appeared via video conference with his non-attorney representative, Maureen Nowak, before ALJ Andrew T. Palestini for an administrative hearing. Ackerman, Ackerman's sister, Mary Fuss, and vocational expert Marian Jacobs testified at the hearing. In a decision dated June 21, 2006, the ALJ denied Ackerman's claims. The ALJ determined that Ackerman was not disabled and not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing his past relevant work as an insulation laborer and assembler. The ALJ also determined that he was functionally capable of performing other work that exists in significant numbers in the national economy. Ackerman appealed the ALJ's decision. On May 7, 2008, the Appeals Council denied Ackerman's request for review. Consequently, the ALJ's June 21, 2006 decision was adopted as the Commissioner's final decision.

---

[1] Ackerman disputes that his disability onset date is May 30, 2001. The Court will take up Ackerman's dispute later in this Order.

On June 10, 2008, Ackerman filed this action for judicial review. The Commissioner filed an Answer on September 10, 2008. On October 14, 2008, Ackerman filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that he could perform his past relevant work or other work that exists in significant numbers in the national economy. On December 10, 2008, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On August 5, 2008, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision 'if the ALJ's findings are supported by substantial evidence on the record as a whole[.]'" *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being

3

supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Wagner*, 499 F.3d at 848 (citing *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls withing the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001) ("As long as substantial evidence in the record supports the Commissioner's decision, we may not

reverse it either because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.").

## IV. FACTS

### A. Ackerman's Education and Employment Background

Ackerman was born in 1951. He completed high school and had no further vocational training. When asked whether he had difficulty reading or understanding written material, Ackerman responded that sometimes he had reading and comprehension problems due to lack of concentration.

The record contains a detailed earnings report for Ackerman. The report covers Ackerman's employment history from 1980 to 2005. From 1980 to 2000, Ackerman earned between $17,814.28 (1980) and $47,125.34 (2000). In 2001, he earned $14,267.31. In 2002, Ackerman worked at Lowe's and earned $9,582.14. In 2003, he worked at Cabelas and earned $2,198.98. He had no earnings in 2004 or 2005.

### B. Administrative Hearing Testimony

#### 1. Ackerman's Testimony

At the administrative hearing, Ackerman's representative questioned Ackerman about his difficulties with depression. Ackerman testified that his symptoms consisted of crying, difficulty sleeping, and "a huge amount of anxiety." Ackerman also indicated that he lacks energy and has difficulty concentrating and remembering when he is depressed. Ackerman explained that doctors treated his depression with medication, but he considered the medication to be unhelpful. Later, he testified that the drug Effexor helped him, but even with Effexor, it is hard for him to leave his house because he is unable to "let go." Ackerman's representative and Ackerman further discussed his use of medication:

> Q: Now in the file there are notes that talk about you stopping your meds -- I mean, not taking your meds, and taking a while to go back to the doctor. Is there a reason for this?
>
> A: I have a real big problem leaving the house. There would be days where I might need a gallon of milk, and it might be like four days before I go to get it because

5

> I wouldn't feel safe to do it. You know, I just felt like almost like there was a lock on the door, I couldn't, you know, I just couldn't leave unless I felt conditions were right to do so.

(Administrative Record at 363.)

Next, Ackerman's representative and Ackerman discussed his sleeping problems:

> Q: Now you mentioned difficulty with sleeping during this time period. Do you sleep at night?
>
> A: No. Most of the time I will -- I can be dead tired at nine o'clock at night, and I will lay there and toss and turn, and normally will go to sleep about daylight, about 5:00-6:00 in the morning.
>
> Q: And how long will you sleep at a time?
>
> A: Sometimes it's just minutes, sometimes it's maybe two or three hours, you know. But it's been such a long time since I've had, you know, eight-hour deep sleep that I don't even hardly remember what it's like.

(Administrative Record at 365-66.)

When asked what prevented him from working a full-time job, Ackerman answered that he could not "wrap" his mind around using a computer. He also indicated that he could not deal with the stress and pressure of dealing with customers. He further explained that leaving the house is difficult for him, because when he leaves, he spends all of his time worrying about it.[2]

### 2. *Mary Fuss' Testimony*

Mary Fuss ("Fuss") is Ackerman's sister. At the hearing, Fuss testified that Ackerman's depression caused him to have difficulty with: (1) leaving his home, (2) sleeping, and (3) concentrating. Specifically, Fuss stated that Ackerman was afraid to leave his house because "[h]e was afraid that someone would rob him. He was afraid to

---

[2] *See* Administrative Record at 373 ("And, you know, the other thing is, you know, just to leave the house, you know, to be gone for any length of time, you know, my mind would be there, you know.").

be around people. He just wasn't sure of himself."[3] Fuss further explained that Ackerman was paranoid of people sneaking around his house and/or breaking into his house. Fuss also testified that Ackerman was "paranoid about being around people. He's not comfortable at all. He will like get somewhere and he will like panic."[4] According to Fuss, she also observed Ackerman's difficulty with sleeping, and stated that when he performed any type of physical activity, it made him "exhausted." In discussing Ackerman's medications, Ackerman's representative asked Fuss:

> Q: And there's information in the file that mentions at times that he stopped taking his meds, and he deteriorates. Is this an intentional thing that he stops the meds?
>
> A: No. He would emotionally just shut down. He just would like flat line. The power of concentration, to be able to do anything, he would just totally shut right down.

(Administrative Record at 382.)

### 3. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Marian Jacobs with a hypothetical for an individual who is limited to work that should be:

> . . . simple, routine, and repetitive, should involve no more than short, superficial interaction with the public, although the public may be present in the work area, as long as it is not more than a few people at a time. It also should involve no more than short superficial interaction with co-workers when performing [] job duties. Other workers could be physically present in the work area. In order to avoid excessive stress, the work should not involve very fast mental pace, strict deadlines, handling emergency situations or complaints, or directing the work of others. [The individual] should not be required to remember and relate to others detailed information or data in order to complete his job duties.

---

[3] *Id.* at 380.

[4] *See* Administrative Record at 383.

(Administrative Record at 388.) The vocational expert testified that under such limitations, Ackerman could perform his past relevant work as an insulation laborer and as an assembler. The vocational expert further testified that Ackerman could also perform the following work: (1) motel or hotel housekeeping cleaner (3,700 positions in Iowa and 400,000 positions in the nation), (2) laundry folder (100 positions in Iowa and 16,000 positions in the nation), (3) nighttime stock clerk (130 positions in Iowa and 18,000 positions in the nation), and (4) industrial cleaner (13,000 positions in Iowa and 1,000,000 positions in the nation). The ALJ and vocational expert discussed further limitations regarding Ackerman's ability to be employed:

> Q: Secondly, what effect would it have if [Ackerman] could not interact with the public or co-workers at all, would that affect his ability to perform any of those jobs?
>
> A: Yes. It would.
>
> Q: And what affect would it have?
>
> A: If he can't interact with co-workers at all, I think it would preclude those jobs that I identified.
>
> Q: Would there be other work that he could still do?
>
> A: Not that I'm aware of.
>
> Q: Also, if [Ackerman] would be unable to attend the work site or possibly remain at the work site because of his anxiety about leaving his house, would that affect his ability to perform those jobs?
>
> A: Yes. It would.
>
> Q: And what would happen?
>
> A: I think it would take him out of competitive employment, in my opinion.

(Administrative Record at 390.)

### C. Ackerman's Medical History

On April 22, 2002, Ackerman presented as a new patient with Jill L. Buschmann ("Buschmann"), ARNP ("Advanced Registered Nurse Practitioner"), complaining of difficulty with depression. Buschmann provided the following description of Ackerman's depression history:

> History of his present illness demonstrates that he moved to
> Iowa from New York state approximately one year ago.
> Shortly after moving to [Iowa,] he was a way from home for
> a couple of days and when he returned his house had been
> broken into. This was understandably very upsetting for him.
> He tends to obsess on this and about his personal safety. He
> apparently moved to [Iowa] because of some problems with
> safety issues where he was living in New York. He reports
> that he was living next to some drug dealers and felt that they
> were stalking him and following him. This was very upsetting
> to him when he moved to Iowa and then had some immediate
> problems with an invasion of his privacy. [Ackerman] states
> that he has been having some troubles with sleeping. He feels
> very anxious most of the time. . . . He has not worked outside
> of the home since last October. He has not left home much
> except to get the essentials. He keeps his doors locked a lot.

(Administrative Record at 198.) Buschmann diagnosed Ackerman with depression and anxiety. Buschmann treated Ackerman with medication and requested that he return in two weeks to re-evaluate his symptoms.

On June 12, 2002, after missing two scheduled appointments, Ackerman returned to see Buschmann. When he met with Buschmann, he had been off his medications for about one month. Buschmann noted that initially Ackerman had been doing well on his medication, but "felt that he didn't need it any more and could recover from this depression on his own."[5] However, when Ackerman began working at Lowes at the beginning of June, his depression and anxiety symptoms worsened due to work stress. Buschmann continued Ackerman's diagnosis of depression with anxiety. Buschmann treated Ackerman's depression with medication and instructed him to "check in with us prior to running out of his medications. I wrote this down for[] him explicitly."[6] Ackerman acknowledged that he needed to be compliant with his medications.

---

[5] *See* Administrative Record at 197.

[6] *Id.* at 196.

In November 2002, Ackerman changed medications from Zoloft to Effexor. In December 2002, Ackerman informed Buschmann that the Effexor had not helped his depression. Buschmann switched his medication to Lexapro. Ackerman had a follow-up appointment with Buschmann on July 28, 2003, and indicated that he "felt much better when he was taking the LEXAPRO and does feel that he is doing well on this."[7] Buschmann noted, however, that Ackerman has "a lot" of compliance issues and when he fails to take his medications, his depression becomes worse. Buschmann continued treating Ackerman with Lexapro.

On October 6, 2003, Ackerman visited with Dr. Scot R. Christiansen, M.D., regarding his difficulties with depression. At the outset, Dr. Christiansen noted that Ackerman had seen his colleague, Buschmann, several times and was meeting with him because Ackerman needed "certification for the disability people from two physicians."[8] In talking with Ackerman, Dr. Christiansen found that Ackerman was: (1) afraid to leave his home, (2) often felt fearful and tense, and (3) had periods of tearfulness. Dr. Christiansen diagnosed Ackerman with a history of recurrent depression with prominent anxiety and symptoms and questionable delusional thinking. Dr. Christiansen continued to treat Ackerman with Lexapro. Lastly, Dr. Christian opined that "I do believe [Ackerman] is genuinely disabled. Discussed with [Ackerman] that with further evaluation and treatment I am certainly expecting he'll get back to normal."[9]

Dr. Christiansen also provided Disability Determination Services ("DDS") with a letter, dated October 6, 2003, in which he opined that:

> [Ackerman] is a . . . patient who has been with out clinic since April of 2002. He has had ongoing treatment for depression and anxiety, and his symptoms, unfortunately, are not adequately controlled. We are making arrangements for

---

[7] *Id.* at 192.

[8] *See* Administrative Record at 192.

[9] *Id.* at 190.

> [Ackerman] to have further treatment with a counselor with
> possible medication changes but, for the time being, I consider
> him disabled from any type of work due to his depression.

(Administrative Record at 191.)

On October 8, 2003, Ackerman had an initial counseling session with Connie Seth

("Seth"), MSW, LISW, for his depression. Ackerman informed Seth that he had:

> an increase in depressive symptoms, anxiety and he has
> difficulty focusing, difficulty concentrating, has a poor sleep
> pattern. He has a low self-esteem. . . .
>
> He voiced being very angry. He states he takes on a lot of
> guilt. . . . He states he does not enjoy doing what he used to
> enjoy in the past, as far as hunting and being outside. He feels
> overwhelmed. He voices having some paranoia from having
> his house broken into shortly after he moved here three years
> ago and is still overwhelmed with the anger from that. He
> voiced mood swings.

(Administrative Record at 220.) Seth diagnosed Ackerman with major depressive disorder

and calculated his GAF ("Global Assessment of Functioning") score at 60. Seth concluded

that Ackerman "is suffering from major depressive disorder as exhibited by his difficulty

focusing, concentrating, keeping a job due to not being able to focus, his low self-

esteem, . . . his easy irritability and anger, and mood swings."[10]

On January 14, 2004, Ackerman met with Buschmann to discuss his depression.

Ackerman informed Buschmann that he had been out of Lexapro for one month and his

depression had worsened. Buschmann noted that:

> This is a pretty typical pattern for [Ackerman] since we have
> seen him. He does fairly well with the antidepressants but for
> whatever reason allows himself to run out and then doesn't ask
> for samples or get them renewed and then starts having
> increasing problems with his depression.

(Administrative Record at 190.) Buschmann diagnosed Ackerman with depression and

continued to treat him with Lexapro.

---

[10] *See* Administrative Record at 221.

On March 24, 2004, Dr. Herbert L. Notch, Ph.D., reviewed Ackerman's medical records and provided DDS with a Psychiatric Review Technique assessment and mental RFC assessment for Ackerman. On the Psychiatric Review Technique assessment, Dr. Notch diagnosed Ackerman with depression controlled with medication and provided a GAF score of 60. Dr. Notch determined that Ackerman had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Notch found that Ackerman was moderately limited in his ability to: carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. In conclusion, Dr. Notch noted that:

> Based on the findings, [Ackerman's] allegations are somewhat eroded and credibility, due to [Ackerman's] lack of compliance with med[ication.] He tends to run out of medication and then does not immediately get restarted on his meds. At those times, his mood de-compensates and [Ackerman] begins to be less stable. Nevertheless, he gets back on the medication and does quite well.
>
> Based on the findings, [Ackerman] does appear able to do simple one or two-step work-like activities on a consistent basis. He may have some problems with attention and concentration. He may have some problems interacting with supervisors, co-workers and the public, especially when he has failed his medication. He is generally able to use fair judgment and handle changes in the work place without significant difficulty.

(Administrative Record at 228-29.)

On November 17, 2004, Ackerman met with Seth for his clinical evaluation update.
Seth summarized her findings upon examination:

> . . . Ackerman . . . is suffering from major depressive
> disorder exhibited by his difficulty focusing and concentrating,
> difficulty keeping a job, low self-esteem, . . . easy irritability
> and anger and mood swings. [Ackerman] needs to be able to
> stabilize his mood and remain medication compliant. He also
> needs to be able to increase his self-esteem and begin to feel
> better about himself. . . .

(Administrative Record at 261.) Seth diagnosed Ackerman with major depressive disorder
and assessed a GAF score of 65. Seth recommended continued individual counseling on
a bi-weekly to monthly basis and continuation of medication as treatment.

The record contains a letter written by Buschmann, dated April 6, 2005, and
addressed to: "To Whom It May Concern." In the letter, Buschmann explained that
Ackerman has been her patient and Dr. Christiansen's patient since April 2002.
Buschmann noted that Ackerman had been treated for major depressive disorder, paranoia,
and anxiety. Buschmann further noted that Ackerman "has been treated with several
different medications, and has been rather refractory to treatment."[11]   Buschmann
concluded that:

> Due to the depressive symptoms with the paranoia and anxiety,
> he has been unable to hold down gainful employment since his
> treatment started back in 2002. He has had problems with
> insomnia and difficulty following through, which is all related
> to his mental illness. [Ackerman] has been considered
> disabled from any type of work due to these symptoms since
> the onset back in April of 2002.

(Administrative Record at 248.)

On April 19, 2005, Ackerman met with Dr. Marcus Pressler, M.D., and Colleen
S. Brems ("Brems"), ARNP, for a second opinion and recommendations for the treatment

---

[11] *See* Administrative Record at 248.

of chronic depression with paranoid ideation. Upon examination, Dr. Pressler and Brems determined that Ackerman's depression was severe and chronic. Specifically, Dr. Pressler and Brems opined that "[h]is mood disorder in addition to his rigid paranoia seriously impairs his ability to make decisions, interact with others in even simple situations for brief periods, or consistently leave his home to maintain employment."[12] Dr. Pressler and Brems further opined that "[i]t appears that [Ackerman's] illness significantly impairs his ability to be gainfully employed. In light of his severe self-isolation and paranoid ideation, his prognosis for returning to employment within one year is poor."[13] Brems diagnosed Ackerman with major depressive disorder with psychotic features and severe social phobia. Brems assessed a GAF score of 45. Dr. Pressler agreed with Brems assessment.[14] Dr. Pressler and Brems recommended a retrial of Effexor and added risperidone as medications for treating Ackerman.

On November 1, 2005, at the request of DDS, Ackerman underwent a psychological examination by Dr. Thomas R. Anderegg, Ph.D., for a mental status report and psychodiagnostic assessment. Dr. Anderegg administered the MMPI-2 test to Ackerman, and determined that the results were valid. Specifically, the test results showed that:

> Eight of Mr. Ackerman's clinical scales are statistically significant. Individuals with similar clinical scales tend to be in a great deal of emotional turmoil. Individuals with similar profiles tend to be depressed, worried, and tense. They anticipate problems before they occur. They over react to minor provocation. They experience a lot of somatic symptoms including fatigue and exhaustion. These individuals feel indecisive, inadequate, and insecure. They are very passive in their relationships. They have difficulty making appropriate assertions. They look to others for support and help while at the same time being deeply suspicious of them. They tend to have ideas of reference, feelings of being

---

[12] *Id.* at 246.

[13] *See* Administrative Record at 247.

[14] *Id.* (Staff Physician Comments).

> mistreated, are overly sensitive to the reactions of others, and
> can harbor both resentments and grudges.
>
> These individuals tend to be extremely shy and ill-at-ease in
> new situations. They are easily embarrassed. They do not
> enjoy being involved with groups or crowds of people. They
> feel unable to effect change in their own life situations.

(Administrative Record at 281.) According to Dr. Anderegg, the MMPI-2 test results revealed that Ackerman has a high level of emotional distress, including significant levels of anxiety, depression, and suspiciousness. Dr. Anderegg diagnosed Ackerman with major depressive disorder with psychotic features, severe social phobia, paranoid and avoidant personality traits, and severe interpersonal problems. Dr. Anderegg assessed a GAF score of 45. Dr. Anderegg concluded that:

> Mr. Ackerman has the ability to remember simple instructions,
> procedures, and locations. He would require increasing levels
> of supervision and repetition to learn more complicated
> instructions due to mild problems with attention and
> concentration. This individual's persistence is highly
> dependent on his emotional state. He reports long periods of
> time where he does not have any energy or the motivation to
> do even basic activities of daily living. Pace appears to be in
> the normal range. This individual's severe anxiety and
> suspiciousness would interfere to a marked degree with his
> ability to relate to supervisors, co-workers, and the public.
> Mr. Ackerman's judgment is basically intact. He is capable of
> responding to changes in the work place.

(Administrative Record at 282.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Ackerman is not disabled. In making this determination, the ALJ was required to complete the five-step sequential evaluation process provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Robson v. Astrue*,

526 F.3d 389, 392 (8th Cir. 2008); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) the claimant's work activity, if any; (2) the medical severity of the impairment; (3) whether the medical severity of the impairment equals one of the listings in Appendix 1 of Subpart P; (4) the claimant's residual functional capacity (RFC) and past relevant work; and (5) whether the claimant can perform other jobs in the economy given the claimant's RFC, age, education, and work experience.

*Robson*, 526 F.3d at 392 (citing 20 C.F.R. § 404.1520(a)(4)); *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (same). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*; *see also Goff*, 421 F.3d at 790 ("If the claimant establishes her inability to do past relevant work, then the burden of proof shifts to the Commissioner."). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Ackerman had engaged in substantial gainful activity from May 15, 2001 to July 10, 2001 (insulation firm); August 20, 2001 to October 14, 2001 (Lumber Specialty); and June 3, 2002 to December 10, 2002 (Lowe's). At the second step, the ALJ concluded from the medical evidence that Ackerman had the following severe combination of impairments: major depressive disorder and social phobia. At the third step, the ALJ found that Ackerman did not have an impairment or combination of impairments listed in "[20 C.F.R. § 404,] Appendix 1, Subpart P, Regulations No. 4 [(the Listing of Impairments)]." At the fourth step, the ALJ determined Ackerman's RFC as follows:

> [Ackerman] has had the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for: the work should be simple, routine, repetitive. It should involve no more than short superficial interaction with the public, but the public may be present in the work area as long as it is not more than a few people. It should involve no more than short superficial interaction with coworkers when performing job duties. Other workers may be physically present in the work area. In order to avoid stress, the work should not involve very fast mental pace, strict deadlines, the handling of emergency situations or complaints, or directing others. [Ackerman] should not be required to remember and relate to others detailed information or data to complete the job duties.

(Administrative Record at 33.) At the fourth step, the ALJ determined that Ackerman was capable of performing his past work as an insulation laborer and as an assembler. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Ackerman could also work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Ackerman was not disabled.

### *B. Objections Raised by Claimant*

Ackerman argues that the ALJ erred in four respects. First, Ackerman argues that the ALJ failed to properly evaluate the opinions of Dr. Anderegg. Second, Ackerman argues that the ALJ's decision with regard to Dr. Anderegg's opinions is not supported by

substantial medical evidence from an examining source. Third, Ackerman argues that the ALJ failed to properly evaluate his subjective allegations of disability. Fourth, Ackerman argues that the Appeals Council failed to adequately review the multiple statements from his family and friends.

### 1. Dr. Anderegg's Opinions

Ackerman argues that the ALJ failed to adequately explain his reasons for rejecting Dr. Anderegg's opinion that his severe anxiety and suspiciousness would interfere to a marked degree with his ability to relate to supervisors, co-workers, and the public. Ackerman maintains that the ALJ's "conclusions are based on a factual mistake."[15] Specifically, Ackerman argues that the ALJ's decision is flawed because:

> The primary reason given by the ALJ was that Dr. Anderegg's opinion 'was not consistent with the claimant's successful work at substantial gainful activity levels after his alleged onset of disability. This is simply wrong. The ALJ consistently, and incorrectly, referred to Mr. Ackerman's alleged onset date as May 30, 2001. . . . Although the ALJ found Mr. Ackerman engaged in substantial gainful activity after May 30, 2001, the ALJ did not find that Mr. Ackerman engaged in substantial gainful activity after December 10, 2002. Mr. Ackerman did not engage in substantial gainful activity after his alleged onset date of December 10, 2002.

(*See* Ackerman's Brief at 14.) Ackerman further contends that the ALJ mischaracterized his ability to relate to other people based on his ability to go shopping.

A review of the record shows that on his applications, Ackerman initially provided a disability onset date of November 30, 2002. At a later date, Ackerman modified his disability onset date to May 30, 2001. He did so by circling the date he originally provided on the applications, handwriting in the modified disability onset date, and initialing the modification.[16] Thus, in his decision, the ALJ used May 30, 2001 as the

---

[15] *See* Ackerman's Brief at 14.

[16] *See* Administrative Record at 77 (application for disability insurance benefits),
(continued...)

disability onset date.[17] More specifically, the ALJ found at step one of the five-step sequential evaluation, that Ackerman engaged in substantial gainful activity from May 2001 to December 2002.[18] Because the ALJ moved onto steps two through five of the sequential evaluation, the Court assumes that the ALJ determined that Ackerman did not engage in substantial gainful activity after December 2002. If the ALJ had determined that Ackerman engaged in substantial gainful activity for the entire disability insured status period, the five-step sequential evaluation would have ended and Ackerman would have been found to be not disabled. *See Pelkey*, 433 F.3d at 577 ("If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled."). The Commissioner agrees: "Importantly, the ALJ did not consider [Ackerman's] work activity as a conclusive finding that he engaged in substantial gainful activity and, thus, was not disabled at the first step of the sequential evaluation for the entire period[.]"[19]

Ackerman, however, points out that DDS "correctly noted [his] alleged onset date was December 10, 2002 and evaluated his claim using that date."[20] For example, on a Social Security Administration ("SSA") Work Activity Report, dated January 30, 2004,

---

[16](...continued)
284 (application for SSI benefits).

[17] *Id.* at 18 ("alleging the inability to work since May 30, 2001"), 20 ("alleged disability since May 30, 2001").

[18] *Id.* at 20-21, 32-33 (ALJ's determination that Ackerman had engaged in substantial gainful activity from May 15, 2001 to July 10, 2001 (insulation firm); August 20, 2001 to October 14, 2001 (Lumber Specialty); and June 3, 2002 to December 10, 2002 (Lowes)).

[19] *See* Commissioner's Brief at 16.

[20] *See* Ackerman's Brief at 14.

the SSA worker recommended a disability onset date of December 10, 2002.[21] Ackerman also points out that in a letter, dated July 27, 2006, Ackerman's representative informed the Appeals Council that "[Ackerman is] alleging inability to work since 12-10-02 when he left [t]he Lowe's Job. (This amended onset date was submitted prior to the hearing amending the date to 12-10-02.)[.]"[22] There is no evidence in the record, however, that Ackerman's representative submitted an amended disability onset date prior to the administrative hearing. There is also no evidence in the record that the disability onset date issue was brought up with the Administrative Law Judge ("ALJ") at the administrative hearing. Additionally, the Appeals Council did not address Ackerman's representative's letter regarding the amended disability onset date of December 10, 2002.

Thus, the Court is confronted with conflicting evidence in the record as to whether Ackerman's alleged disability onset date should be May 30, 2001 or December 10, 2002. Significantly, the date of Ackerman's alleged disability onset is important for the analysis of whether the ALJ properly rejected Dr. Anderegg's opinion that Ackerman's severe anxiety and suspiciousness would interfere to a marked degree with his ability to relate to supervisors, co-workers, and the public. If the disability onset date is December 12, 2002, then the ALJ's reliance on Ackerman's "successful work at substantial gainful activity levels after his alleged onset of disability date which exposed him to interaction with coworkers, supervisors and the public" is an unpersuasive reason for rejecting Dr. Anderegg's opinion because the ALJ's decision indicates that Ackerman had no substantial gainful activity after December 10, 2002. Because Ackerman acknowledges that he was not disabled prior to December 10, 2002, the ALJ's decision recognizes that Ackerman had no substantial gainful activity after December 10, 2002, and there is

---

[21] *See* Administrative Record at 123; *see also* 171-74 (two Case Development Sheets, dated February 3, 2004 and July 13, 2004, which provided that Ackerman's alleged disability onset date was December 10, 2002); 228 (Medical Consultant Review Summary where the doctor indicated that Ackerman's alleged disability onset date was December 12, 2002).

[22] *See* Administrative Record at 300.

evidence in the record from DDS and Ackerman's representative that Ackerman's disability onset date should be December 10, 2002, the Court determines that Dr. Anderegg's opinions should be considered under a disability onset date of December 10, 2002.

Turning to the ALJ's decision, in determining the proper weight of Dr. Anderegg's opinions, the ALJ found:

> [Dr. Anderegg's] opinion to be fairly well supported and has given the opinion a good deal of weight except as to interaction with others. . . . With respect to interaction with others, the opinion is not consistent with [Ackerman's] successful work at substantial gainful activity levels after his alleged onset of disability date which exposed him to interaction with coworkers, supervisors and the public. He has been able to shop which indicates his ability to be exposed to others. At the hearing, [Ackerman] did not allege difficulty getting along with customers. [Ackerman] stated he did not get along with one person at Lowe's, but then added the person didn't get along with anyone. Over the years he had gotten along with some coworkers, others not.

(Administrative Record at 29.)

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. §§ 404.1527(d), 416.927(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*, 552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Having reviewed the entire record, the Court determines that the ALJ's reasons for rejecting Dr. Anderegg's opinions regarding Ackerman's ability to interact with others are

inadequate. Under a disability onset date of December 12, 2002, the ALJ's primary reason, that "[w]ith respect to interaction with others, [Dr. Anderegg's] opinion is not consistent with [Ackerman's] successful work at substantial gainful activity levels after his alleged onset of disability date which exposed him to interaction with coworkers, supervisors and the public," is without merit. The record is clear that Ackerman had no substantial gainful work activity after December 12, 2002. Therefore, Ackerman's successful work prior to December 12, 2002, is not inconsistent with his alleged disability after December 12, 2002, and should bear little weight in the ALJ's final disability determination.

Additionally, the record with regard to Ackerman's ability to go shopping is not fully and fairly developed. The ALJ's statement that Ackerman is "able to shop which indicates his ability to be exposed to others" does not take into account Dr. Anderegg's report that:

> Mr. Ackerman indicates that he has a great deal of anxiety about being in public. He will not eat with others. When he used to go hunting, he would sit in the car when his buddies went into restaurants. . . . He feels that everybody is watching him and he does not feel safe. He indicates that he has a very difficult time going into stores. He tends to just go to stores that he has been in before because they feel safer. He will pick a time to go to the store when it is the least crowded. When he gets into a store, he will break out into a cold sweat and try to get the shopping done as quickly as possible. . . . Most of his socialization is either with his sisters on the phone or with a couple of the guys from the hunting club. However, his friends in the hunting club have noted that they saw more of him when he lived in New York than they do of him now when he lives near them.

(Administrative Record at 278-79.)[23]  It is clear that the record contains evidence that Ackerman has great difficulty shopping and being in public. The ALJ's failure to address this evidence when discussing Ackerman's ability to go shopping calls into question his rejection of Dr. Anderegg's opinions on that ground. Accordingly, the Court finds the ALJ's reasoning with regard to Ackerman's ability to go shopping is both inadequate and not fully and fairly developed to support his rejection of Dr. Anderegg's opinions. The Court concludes that the ALJ's reasons for rejecting Dr. Anderegg's opinions are inadequate and do not properly show an inconsistency with the record as a whole. *See Wagner*, 499 F.3d at 848. Therefore, the Court finds that remand is appropriate. On remand, the ALJ should consider Dr. Anderegg's opinions in light of a disability onset date of December 12, 2002 and provide clear reasons for accepting or rejecting Dr. Anderegg's opinions that are supported by a fully and fairly developed record.

### 2.     *Substantial Medical Evidence*

Ackerman argues that the ALJ's decision regarding Dr. Anderegg's opinions is not supported by substantial medical evidence from an examining source. Specifically, Ackerman asserts that:

> the opinions of Dr. Pressler and Ms. Buschmann, as well as the medical evidence generally, support Dr. Anderegg's conclusion that Mr. Ackerman has a 'marked' limitation in dealing with supervisors, co-workers, and the public. . . . There are no contrary medical opinions from an examining source supporting the ALJ's findings. As a result, the ALJ's decision regarding [Ackerman's] ability to interact with others is not supported by substantial medical evidence.

(*See* Ackerman's Brief at 19.) The Commissioner responds that the ALJ "fully considered and outlined at length the medical evidence showing objective findings that were not

---

[23] *See also* Administrative Record at 245 ("He makes himself go to [the] grocery store once a month to buy necessities. On [] those days, he races through the aisles, to get out of the grocery store as fast as possible. . . . He doesn't leave his home unless necessary.").

extreme, that [Ackerman] did well on medication, and that [Ackerman] was not compliant with treatment."[24]

An ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184(S.S.A.).

The ALJ's decision provides a lengthy and thorough discussion of the relevant medical evidence in this case. However, the ALJ provides no discussion of the medical evidence as it pertains to Dr. Anderegg's opinions with regard to Ackerman's ability to interact with others. Because Ackerman's ability to interact with others is significant to his RFC determination, the Court concludes that this matter should be remanded for further consideration of the medical evidence as it pertains to Dr. Anderegg's opinions. *See Guilliams*, 393 F.3d at 803. On remand, the ALJ must explain his reasons for accepting or rejecting the medical evidence as it relates to Dr. Anderegg's opinions and Ackerman's RFC assessment. Only then will the Court be able to determine "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester*, 416 F.3d at 889.

---

[24] *See* Commissioner's Brief at 22.

### 3. *Credibility Determination*

Ackerman argues that the ALJ failed to properly evaluate his subjective allegations of disability. Ackerman maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Ackerman's testimony and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski*, 739 F.2d at 1322. The absence of objective medical evidence to support a claimant's subjective complaints is also a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). The ALJ, however, may not disregard a claimant's subjective complaints "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322; *see also Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claim because they are not fully supported by medical evidence.").

Instead, "'[a]n ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647

25

(8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

In his decision, the ALJ made the following credibility determination:

> The record is not clear on exactly why [Ackerman] left his family in New York to come to Iowa. His explanation that a hunting buddy lived in Iowa so he came here is not all that persuasive, except that he figured he could live in the woods and hunt his meat as needed and live cheap. Things allegedly went downhill when his house was broken into. [Ackerman] says it was a local kids' hang out and they wanted him out of it. [Ackerman] has alleged to treating sources that he had increased symptoms due to concern about kids breaking in, and further maintained at the hearing that he was on guard all the time. At the hearing the undersigned asked [Ackerman] why didn't he just move? [Ackerman] inconsistently responded that he really liked it there. [Ackerman] had also stated it cost money to move. His explanation that he might have the same problem or a bad landlord somewhere else is likewise unpersuasive. The responses indicate the conditions of which he complains are not as severe or intolerable as he makes out. The record as a whole establishes no change of condition since [] he left his job in New York except the loss

26

of his wife's support and alleged fear of his house being broken into again.

Based on the above discussion and inconsistencies in the record as a whole, [Ackerman's] allegations concerning the existence, persistence and intensity of symptoms and functional limitations are not given full weight or credibility, but only such as reflected in the residual functional capacity assigned by the undersigned.

(Administrative Record at 30.)

In his decision, the ALJ properly set forth the law for making credibility determinations under *Polaski* and the Social Security Regulations.[25] The ALJ failed to apply the law, however, in determining the credibility of Ackerman's testimony and subjective allegations. Specifically, the Court finds that the ALJ's decision lacks the required detail for discrediting a claimant and explaining the inconsistencies between the claimant's subjective allegations and the record as a whole. *See Baker*, 159 F.3d at 1144; *see also Pelkey*, 433 F.3d at 578 (the ALJ must give reasons for discrediting a claimant). The ALJ discusses Ackerman's decision to move to Iowa from New York at length, but offers nothing in terms of the *Polaski* factors and how those factors relate to Ackerman's subjective testimony and credibility. The ALJ simply states that based on "inconsistencies in the record as a whole, [Ackerman's] allegations concerning the existence, persistence and intensity of symptoms and functional limitations are not given full weight or credibility."[26] The ALJ's decision provides no reasons for discounting Ackerman's testimony other than his allegations are inconsistent with the record as a whole. *See Pelkey*, 433 F.3d at 578 (the ALJ must give reasons for discrediting a claimant). Because the ALJ's decision lacks any discussion of the reasons for discrediting Ackerman, except that his allegations are inconsistent with the record as a whole, and lacks full consideration of all of the *Polaski* factors, the Court finds that remand is appropriate for the ALJ to

---

[25] *See* Administrative Record at 21-22.

[26] *Id.* at 30.

27

further develop the record with regard to Ackerman's credibility. On remand, the ALJ shall set forth in detail his reasons for finding Ackerman's subjective allegations to be credible or not credible. If on remand, the ALJ finds Ackerman's testimony not to be credible, the ALJ shall fully explain the reasons for his credibility determination and fully explain the inconsistencies between Ackerman's subjective allegations and the evidence in the record.

### 4.    *New Evidence*

Ackerman submitted several statements from friends and family to the Appeals Council following the ALJ's written decision. The Appeals Council determined that those reports deserved:

> little weight. While there [sic] statements are sincere, their perception that your impairment is of a severity to preclude all work activity, is not supported by the record as a whole. Moreover, these individuals see you on an infrequent basis and while the Council has considered the statements made by each of these individuals, they are not acceptable medical sources. These sources also appears [sic] to be unaware of your medical noncompliance.

(Administrative Record at 9.)

Ackerman refers the Court to *Willcockson v. Astrue*, 540 F.3d 878 (8th Cir. 2008). In *Willcockson*, the Eighth Circuit Court of Appeals discussed witness statements and explained that "statements of lay persons regarding a claimant's condition must be considered when an ALJ evaluates a claimant's subjective complaints of pain [or disability.]" *Id.* at 880-81 (citation omitted). Thus, Ackerman argues that "[a]s in Willcockson, the ALJ's decision in this case should be reversed and this matter remanded for further consideration, including the consideration of the multiple witnesses' statements."[27]

---

[27] *See* Ackerman's Brief at 27.

In *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000), the Eighth Circuit Court of Appeals explained the effect of new evidence submitted to the Appeals Council for a reviewing court:

> The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970(b). The newly submitted evidence thus becomes part of the 'administrative record,' even though the evidence was not originally included in the ALJ's record. *See Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992). If the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence, including the new evidence, it will review the case. *See* 20 C.F.R. § 404.970(b). Here, the Appeals Council denied review, finding that the new evidence was either not material or did not detract from the ALJ's conclusion. In these circumstances we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination. *See Nelson*, 966 F.2d at 366.

*Id.*; *see also Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008) (The final decision of the Commissioner should be affirmed if the decision "is supported by substantial evidence on the record as a whole, including the new evidence that was considered by the Appeals Council."); *Nelson*, 966 F.2d at 366 ("The newly submitted evidence is to become part of what we will loosely describe as the 'administrative record,' even though the evidence was not originally included in the ALJ's record. . . . If, as here, the Appeals council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision."). In *Riley v. Shalala*, 18 F.3d 619 (8th Cir. 1994), the Eighth Circuit noted that a reviewing court:

> must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they

had been available for the original hearing. We consider this to be a peculiar task for a reviewing court.

*Id.* at 622.

Because the Court has already determined that this case should be remanded for further consideration, the Court will not "speculate . . . on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing," *Id.*; instead, the Court will allow the ALJ, on remand, to consider the witness reports for himself.

### *C. Reversal or Remand*

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). "Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and [a court] find[s] that such a denial was improper, [the court], out of '[]abundant deference to the ALJ,' remand[s] the case for further administrative proceedings." *Buckner v. Apfel,* 213 F.3d 1006, 1011 (8th Cir. 2000) (citing *Cox v. Apfel,* 160 F.3d 1203, 1210 (8th Cir. 1998)). If, however, "the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir. 1992); *see also Fowler v. Bowen,* 866 F.2d 249, 253 (8th Cir. 1989) ("When the record is overwhelmingly in support of a finding of disability, there is not need to remand to the Secretary for further consideration."); *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir. 1987) ("Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand."); *Beeler v. Brown,* 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total

record overwhelmingly supports a finding of disability"). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support[] a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to provide adequate reasons for rejecting the opinions of Dr. Anderegg and for rejecting Ackerman's subjective allegations of disability. Accordingly, the Court finds that remand is appropriate.

## VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ should reconsider Dr. Anderegg's opinions using December 10, 2002 as Ackerman's disability onset date and provide clear reasons for accepting or rejecting Dr. Anderegg's opinions. The ALJ's reasoning must be supported by medical evidence and a fully and fairly developed record. The ALJ should also consider all of the evidence relating to Ackerman's subjective allegations of disability, address his reasons for crediting or discrediting those allegations, and properly apply the *Polaski* factors when determining Ackerman's credibility. Lastly, in making his determination on remand, the ALJ should consider the witness reports provided to the Appeals Council after his initial decision.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 21st day of May, 2009.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA